We will now move on to our third in the series, Nilsen v. University of Washington, case number 24-7460, and we'll hear from Mr. Arnold again. Thank you, Your Honor, and may it please the Court again, Nathan J. Arnold on behalf of the appellants. There's certainly a lot of crossover from the things we've already discussed this morning, Your Honor. I'm taking my heartburn. Sovereign immunity here. Why is the University of Washington, the state's university, not entitled to sovereign immunity? Certainly, Your Honor. So the University of Washington predates the state of Washington. It was created through federal land grants. It is controlled by a board of regents that are separate from the state government. By the governor, right? They can be appointed by the governor, but they also cannot be removed by the governor. It's a very interesting middle ground there. Okay, but who pays the tab if a judgment is entered against the university? I believe the university does, Your Honor. I think it comes out of the state. As I read the statute, I think it comes out of the state risk fund. It can, but is not required to be out of the state risk fund. I mean, the university is in one unique situation in that it owns a substantial amount of very valuable property in the heart of downtown Seattle, from which it leases and receives a substantial amount of revenue. But that's not enough to run the University of Washington. So the state has to supplement it, does it not, out of the state treasury to pay some of the salaries of the, I think they have 50 or 60,000 employees. That's a lot. They do have a lot of employees, Your Honor, and that's important for some other analysis in this case. The state treasury does have some funds earmarked for the university. The university does all the time, right, for medical malpractice, for professors who don't get tenure, for torts, for environmental issues, you name it, they face it. So applying Gallant and the cone factors, as I see the record here, it's pretty clear that sovereign immunity should apply. One of the other critical, and I apologize, I don't have a record of citation for this, Your Honor, but one of the other major sources of revenue for the university is the medical center itself, which I believe significantly outstrips- Also grant money, particularly from the federal government. And I believe that significantly outstrips the funds, the- Every state in the union gets a lot of money from outside federal government, maybe less now than they did a couple of years ago, but that doesn't mean the states aren't states, aren't sovereigns. To tell me the University of Washington, particularly the medical center, gets outside money doesn't change its status as a part of the state, does it, under the sovereign immunity doctrine? I agree that that alone is not, so an entity receiving some outside money alone certainly would not tip the scales in the sovereign immunity analysis under either Gallant or cone. Can you address, okay, so this one's on summary judgment, right? Yes, Your Honor. Okay. So we don't have the 12B6 issues, and this one comes down slightly different than the other cases in the focus on undue burden, right? Yes, Your Honor. So it's not really, and why do you think that they're, so in Peterson and now Williams, we said there was no factual dispute. How can you distinguish those two cases from this case? Specifically how this case is distinguishable from both those cases, Your Honor, is in Peterson and Williams, there was no countervailing medical expert testimony by the plaintiffs, and I think that's what- Here you have Dr. Risch, is that- That's correct, Your Honor. What is it about Dr. Risch's testimony that is compelling in your view? Dr. Risch is a epidemiologist who opines upon the, and I'm probably going to use the wrong epidemiological terms here, but for a layperson, the relative risk that the university was willing to accept vis-a-vis those individuals who were vaccinated, where it is acknowledged across the board, unfortunately, other than for Lysol sales, that there were breakthrough infections with this specific vaccine. The vaccine wasn't 100% effective. Correct. So that leads to a conclusion that, so why bother? Does it? I don't think that's the conclusion that it leads to. I think that if you followed a incorrect logic trail too far, you could get there, but I don't think- I don't think you have to follow it very far. He said there are going to be breakthrough infections. Now, he said that based on data that wasn't available at the time, which is all by itself a reason to disregard what he said as best I can figure out. But he says that there are going to be breakthrough infections, and I doubt that that's a shocker to anybody because as far as I know, no vaccine is 100% effective. And then he says, and so we accept a certain amount of reality that there are going to be people that are infected. And then he appears to say, so we ought to accept a little more. Does he say something different than that? Yes, I think he does. What does he say different from that? To one point, the publication date of data versus the availability of data is an important point. I agree with your honor, and this has been an issue that's come up in other cases, specifically with Dr. Risch and other experts. And courts have, I agree, ruled that only the data that are available at the time of the decision making is what should be addressed. And available to the decision maker. The fact that he might be doing academic research that has gathered some material, but he hasn't published it yet, doesn't help the decision maker who doesn't know all that stuff. I agree with that as well, your honor. And the fact that a vaccine is not 100% effective is something the decision maker can probably be expected to know, particularly since these vaccines were in the process of rapid development. Was it Operation Warp Speed, the administration called it. So we were dealing with lots of unknowns. But it's probably true the decision maker had reason to think that the vaccine wasn't going to be a silver bullet, wasn't going to be a cure-all, wasn't going to be 100% effective. So there would be breakthrough cases. I will give you that. But I don't see what else he says that helps your position beyond that. Because he's saying, so you ought to accept more infection from people that aren't vaccinated. What else is he saying? He's saying that the university was willing to accept a much significant. Well, willing to accept is they had no choice. The medical reality is the vaccine is not 100%. So they're doing the best they can. But he's saying they ought to accept more from unvaccinated people just because they have to have some because no vaccine is 100% effective. What else does he say? He's not saying that the rate will get any lower because the breakthrough is going to happen with the vaccinated population. What does he say that doesn't acknowledge that the situation will be worse if unvaccinated people are added to the employment mix? I believe part of his opinion was that the trajectory of efficacy was plummeting at a rate that it would. So back it up. So future projection, not something that's known as fact at the time by the decision maker, that seems to be pretty unhelpful. I have to respectfully disagree with that. Again, I'm not epidemiologist, but my understanding is that one of the things epidemiologists do is take the data that's available at the time and then do mathematical modeling to predict what is going to happen in the future. I think that's part of it. But how does it help to add unvaccinated people to the mix? Because that's what you're talking about here. You're saying the state or in this case, the university dealing almost entirely this group of plaintiffs are health care workers. How does it help to allow unvaccinated people into the mix of health care workers? I think 20 of 21 were health care workers and they were all deemed to have patient contact. So how does it help to add unvaccinated people to the mix of employees that will have patient contact? So I think the proper question is actually the inverse of that, your honor, and that is how does it hurt where the employer is accepting significant risk already? So you'll make the risk worse. That's that's how it hurts. Assuming for a moment that unvaccinated people aren't going to have a better outcome than the vaccinated people, you're talking about the breakthrough cases. How does it help to add a higher risk to the patient population? I think Dr. Rish's point is the acceptability of risk that the university underwent for its secular population include to include, which it couldn't help because there's going to be breakthroughs, even though you don't know how big it's going to be. So the university ought to be prepared to accept greater risk, which you think wasn't going to be that much greater, but was going to be a greater risk because you're adding unvaccinated people to the employment pool. Am I wrong about that? I think that you are correct that necessarily the more well, that's sort of the more employees period with infectious disease. Again, I'm outside of my land a bit as a lawyer, not epidemiologist, but necessarily the more employees you have as well, the greater the risk is going to be. But this goes to some and the risk is is going to be greater. But for unvaccinated people, does he say anything to suggest that the risk for an isn't going to be higher than the risk for a vaccinated employee? He doesn't say that. I don't believe he does, your honor. And so you're telling the university, the the medical center where I used to have to go if I wanted to go home to Hawaii to get clearance back in the day. You're telling them that, OK, because they're going to be breakthrough cases because no vaccine is 100 percent perfectly effective. You've got to accept greater risk from people that are unvaccinated. Isn't that what he's saying? I don't think it's exactly that, your honor. I think it's if the agency is willing to accept a quantum of risk. Well, it has no choice. Let me ask it this way. I thought correct me if I'm wrong. Dr. Rish was simply saying, look, there is this risk factor that is already baked into it. Four point six percent where it's ineffective. Vaccine. You're talking about pure numbers, a number that is so, so much smaller than that by the unvaccinated. So if I guess under that theory, if the request for accommodation had been much higher than four point six percent, Dr. Rish's testimony would have been helpful, which might go back to the first case where there were more numbers. But here, because they were so small, Dr. Rish's point, what I thought was. You've already accepted four point six percent. What's the difference on adding on another point five if the countervailing is accepting their religious accommodation? Is that an undue burden? Isn't that what we're being asked to determine? I think that is correct. You're in to Judge Tolman's point. We're talking about a universe with a lot of employees. And how many were here, wasn't it? Well, we only have we have twenty one plaintiffs here, but how many what do you know? Do you have the numbers on? I mean, what I what I remember was it was four point six. Rish said it was a four point six. And correct me, we'll ask whether that was informant to to Judge Clifton's point was that information that was known at the time, but that it was a third of that. So we're talking about one one percent. Would it even be that high? Was it one percent that we're requesting accommodations? I don't believe it was that higher on. I'd have to go back and check those numbers. I can't swear to it here. My understanding, again, and maybe this is to a more fundamental point, is. I am not someone that should be arguing epidemiology. I've spent a lot of time. But you do need to help us. You do. Fair enough. We're not epidemiologists either, but but we've got to understand the record. Absolutely. But my point is that at summary judgment as the non moving party, we had a battle of experts on this. Well, but I also don't know that you get there. That's a good question. Do you get there by just putting up your own expert? I'm not sure that it's fair to say that a plaintiff puts up an expert. That's enough to get you. I mean, undue burden at the end of the day is a legal question that's informed by the facts. I mean, it's kind of a mixed question. And the question is, have you presented enough here? And I think the nuance in your argument is important to understand. I absolutely agree with your first premise, your honor. If someone were to put me up as an expert for an epidemiologist and I somehow accepted that would not be enough, certainly. So there has to be someone. But in this case, although it is or it may be a mixed question of fact and law, we know from Groff that it's a very fact intensive question. And those facts should be resolved by a jury. If there are genuine issues of material fact in dispute, and I think that's what we're wrestling with, whether or not Dr. Rish's testimony is sufficient to create a genuine issue of material fact on a fact that matters. And what strikes me as unusual about this case, which is not applicable in any of the other cases we've talked about today, is that you have medical experts that the decision makers are relying on. We had an expert vaccination policy committee, I guess, headed up by Dr. Seth Cohen, an infectious diseases specialist, who's basically making a medical recommendation as to how the policy should be implemented with a goal towards minimizing the exposure of unvaccinated individuals to a very vulnerable set of patients and also co-workers who have to work very closely face to face with those patients and treating them. I don't know of any other case that I've seen involving non-medical situations where the decision maker had those kinds of resources to draw on in making the ultimate determination as to whether these exemptions could be accommodated. Do you have any comment on that? I would, I would similarly, I'm making an assumption here, which I should qualify with, but I would certainly think that the University of Washington would be in a good position to do that scientific analysis. We took issue with the ultimate outcome of that analysis through Dr. Rish's opinion as the non-movements in summary judgment. But I think there's, as I've seen my time, the ultimate recommendation, as I understood it from Dr. Cohen and the committee to the leaders of the university, was this is not a risk that we are prepared to accept based on the vulnerable patient population that we serve and the close working relationship between the employees and the patients. And there's another distinguishing factor I think has some interplay with this, your demonstrated by HR email and the University of Washington's accommodation matrix, which I believe was generated through the work of Dr. Cohen and others, that explicitly allows for medical accommodations and does not allow for religious. And that's a major issue in this case. It didn't allow for religious for those who had direct contact. And that applied to everybody, whether they had medical exemptions or religious exemptions, did not. I believe that there are the terminology in the accommodation matrix says that it is an undue hardship to accommodate anyone that. That does not have a temporary medical exemption, and I think the and even a temporary medical exemption meant there may be in the not too distant future, a new improved version of the vaccine that will be better and that can be safely administered based on whatever the reason was for the medical exemption. I don't know. That was a temporary accommodation, right? And I think the temporary accommodation label is really important here because even a temporary accommodation is superior treatment than a termination. So I guess one example that comes to mind would be a pregnant woman. So that after the hopefully safe delivery of the baby, it might she might not be as vulnerable afterwards than she was before. I think that is a good example, Your Honor, and I would be shocked if that's not a specific thing that happened at the university. That, of course, highlights the individualized exemption process and the mechanism that the university used, which is important for how does that violate the Constitution? That's that's what I'm struggling with. I mean, it seems to me that the university was doing the best that it could, bringing enormous resources that most employers, including the Department of Natural Resources and the Department of Children and Family Services, did not have to the decision maker in deciding whether or not it could reasonably grant accommodations to all of the people who had been given exemptions. Well, and the. The I don't want to say it's unique to this case, but an important. Important facts here are that the explicit university policy, as we see in email and we see the matrix, was we are going to provide accommodations for a secular reason that undercuts our compelling interest. For example, that pregnant woman, albeit temporary, is still operating in whatever her capacity is unvaccinated. So her secular activity undercuts the compelling government interest in the same way that a religious exemptor would. But the university made the decision that we are going to provide this benefit, that is accommodation to our those that we determine are medically exempt. But we're going to deny it to our religious. So the university explicitly said, here's a pathway to keeping your career if you have a secular reason, even though it undercuts our compelling government interest. But if you have a religious reason that would result in activity that undercuts our compelling government interest, that pathway is foreclosed. But the problem, as I understood it from the record, was with the permanent exemption, which a religious exemption presumably would be, is it's unlikely that the religious belief is going to change at any time in the future. Right. A couple of things on that point, Your Honor, the OFM guidance. States that all accommodations are to be reviewed on a rolling 60 day basis. So if the guidance is being followed, everything was a temporary accommodation, religious, secular or otherwise. I'm not sure that's true with regard to a sincerely held religious belief. If the although the so the difference there, Your Honor, is is we don't want to conflate exemption and accommodation, I don't think the OFM guidance said we're going to have a 60 day reevaluation of this individual's sincerity, but we are going to have a 60 day reevaluation of the accommodation and mitigation that's in place. So the sincerity, I think, presuming that doesn't change is a fine presumption to your previous comment, though, Your Honor, you indicated that there could be a temporary medical accommodation because a new a new version or a new brand, I suppose, a vaccine could come out that doesn't, for example, contain something that that person is allergic to. Right. Did I hear that correctly? Yeah. OK. So because we know from experience, right, that the vaccines did change. They had to in order to adjust to the variance in the covid virus that that developed. And so even assuming assuming that the religious beliefs do not change, another vaccine could also come out that did not conflict with some of these religious beliefs. For example, we're getting a little far afield here. Admittedly, Your Honor, I don't want to get any more to vaccine taxonomy than I do epidemiology. But if, for example, Novavax vaccine that the university determined could be a way to address a temporary accommodation that would eliminate folks that had an objection to aborted fetal cell lines. Right. So there are several different ways in which we can see that a temporary accommodation, which we believe based on the OFM guidance, they were all temporary anyway, that a temporary accommodation is still a benefit relative to termination. And that benefit, that pathway to that benefit was foreclosed for no other reason than someone had a religious objection while that pathway remained open for those that had a secular objection. Well, but if. Again, the situation is unfolding, the reason they were doing this review because the circumstances were changing, if in fact there was a vaccine developed that did not trigger. The religious objections to use of that vaccine, there would be no burden on the employee coming back and saying, well, I don't have an objection to this X vaccine, so here I'm I'm getting my vaccine, take me back. And no sign that, in fact, that would not have happened if that's how facts had developed. I think that's correct, Your Honor. But that also takes out the practical reality that that person has then since been terminated and presumably is finding something else to do to pay their bills. Well, but I'm not sure how that's something you can impose upon the state. Otherwise, you're suggesting you can't terminate it. You got to keep them. You got to accommodate them, even though it's greater risk for the patients in case a vaccine is developed later that this person will be willing to take. I'm not suggesting that they per se had to do that. I am suggesting that the same logic would apply. And that is another reason why a temporary accommodation is a benefit relative to a termination. We're also dealing with a but but how do you do a temporary accommodation for someone who says the existing vaccines don't work for me? I object to them. That's not something that's going to change within the control of anybody in the circle. That's vaccine development. The temporary exemptions that I understood or the temporary accommodations I understood for medical reasons had more to do with the condition of the employee than it did with I mean, the outside vaccine development could make it available to some employees, I guess. But I understood it had more to do with the employee than something happening outside. So that's a very different situation. They're not very comparable. I think they are comparable, your honor, because the reason for the objection is not what makes the group's comparators. It's the risk of undercutting the government's stated compelling interest that makes them comparators. So similarly to your point, your honor, there is more risk. I think everyone agrees that there was more risk for a religious person to remain unvaccinated, but there is the same amount of risk for the secular person to remain unvaccinated. And the university tolerated that, but completely foreclosed even the pathway for the religious. And that's something we fundamentally take issue with from a free exercise perspective. We've taken you way over, but just so I'm clear, there were 21 plaintiffs here. Some were there were two groups, right? There were patient contact plaintiffs. And can you give me the split up on how that that was? I believe you were correct previously, your honor. I believe it is 21. Well, but but were they all patient contact or nonpatient contact? The bulk of them had some patient contact. We did suggest that there were ways to reduce or mitigate that patient contact. But I believe that all 20 of that set had some patient contact, at least prior to covid. So in their regular right job, that doesn't mean that they couldn't have been accommodated in some other way, perhaps if they only had 10 percent patient contact and particularly where accommodations were being tolerated for secular individuals. We're at the same risk. All right. We'll give you a little bit of time for a rebuttal. Thank you. Thank you. Mm hmm. Good morning again, may it please the court, Zach McKayla, special assistant attorney general for Applebee's, like the two previous cases on the calendar, this one is controlled by this court's precedents, which strongly support a firmness of summary judgment on both of the two live claims. First, the district court correctly granted summary judgment on the employee's failure to accommodate claim is that holding is on all fours with this court's decisions and Peterson and Williams. Under those cases, an unvaccinated workers increased risk of infection and spreading the virus to patients, members of the public or co-workers readily satisfies the undue hardship standard as a matter of law. Well, what OK, so first of all, because that seems to be the focus here. I mean, the sovereign immunity and the qualified immunity, even if we go your way on qualified immunity, you agree that doesn't control the the the state law claim. Right. OK, so that's why and the state law claim is controlled by federal law, which is why you're arguing, I guess, that Peterson controls even the W. L.A.D. claim. Exactly. So is that true? Because here's what the district court said in this case, discounted Dr. Rich's testimony and said Dr. Rich does not opine that the vaccines were ineffective safety measures. I take it you view that statement is consistent with Peterson, but I don't think I read Peterson quite the same way because I mean, under that theory, unless you could say it almost puts the burden on the plaintiff. What if the vaccine were only 10 percent effective? Would this be a different case? I mean, then wouldn't there be more incentive to grant accommodation to religion? I mean, because at that point you're like, well, wait a second, we only have a vaccine that's helping 10 percent of the time. So 90 percent of the vaccines that we're giving aren't effective. And we only have I don't know if you know the numbers, but one percent or less than one percent that are requesting religious accommodation. So wouldn't you say that in that scenario? This regime wouldn't have made any sense. No, and let me explain why, and I think I have to first give you my reading of Peterson and more importantly, Williams, which is even more factually on point. And then second, I'll explain why Dr. Rich's expert report does not create a genuine dispute of material fact. So Peterson and Williams both hold that an increased risk, a substantially increased risk of an employee, an unvaccinated employee contracting and therefore transmitting COVID to members of the public, patients or her co-workers can represent an undue hardship as a matter of law in both Peterson, where Dr. John Lynch of the University of Washington was the expert and in Williams, where Dr. Seth Cohen of the University of Washington was the expert. The uncontroversial evidence was that vaccination substantially or significantly decreased the risk of infection with COVID here. That same fact, again, presented by Dr. Seth Cohen and additionally, Dr. Reingold, the experts for the university. That fact, the increased risk of an unvaccinated person being infected with COVID is undisputed on this record. Dr. Rich's testimony focuses instead narrowly and singularly on a vaccinated person's risk of transmitting COVID after they've been infected. And so Dr. Rich's theory, and this court can accept this as true for the purposes of summary judgment, is that and whether once a person is infected, whether vaccinated or not, it's not material whether they're going to transmit it to someone else. But Dr. Rich quite openly ignores and acknowledges that he's not rebutting a vaccinated person's lower risk of being infected in the first place. And Dr. Rich does acknowledge, of course, which is common sense, that to transmit the virus, you have to first be infected with the virus. So that central principle, a central evidentiary, undisputed principle in Peterson and Williams, an unvaccinated person's substantial increased risk of contracting COVID infection risk is not addressed by Dr. Rich's testimony whatsoever. There are several other problems with Dr. Rich's testimony that numerous other district courts in this district and other districts have recognized in rejecting his opinions, whether on the summary judgment posture or on a Daubert motion posture. So, and Judge Clifton referred to one, which is that he obviously is relying on post 2021 data for conclusions. And that violates the principle that the employer doesn't have a crystal ball. And you look to what the employer had at the time. So, OK, so do I understand Rich's testimony to be, look, the vaccine is basically 95 percent effective. I thought he said there was 4.6 percent of vaccinated individuals suffered from breakthrough infections. Does is that? I don't know if I'm right on this. Is that the same thing as saying the vaccine is 95 percent effective at not allow it? Yes. OK. And Judge Estudillo's opinion in Luxton, which is a case on the calendar for Friday. So those on the panel will look at that. Judge Estudillo really rips. Calvin, you're going to miss out on the infection, though, will spread. You get it. My colleague will be arguing that one, but I'll be back. But I think Judge Estudillo is, for lack of a better word, takedown of Dr. Rich is much more comprehensive in pointing out that. So he's comparing basically a 95 percent efficacy rate with a. And this is Rich's own assumption. He assumes a 100 percent inefficacy rate for unvaccinated persons. So in let's see, where is. Well, I'll leave it there, but it's it's a complete he completely ignores the fact that unvaccinated persons are, in fact, at a much higher risk. In fact, he assumes it's 100 percent of getting infected with covid. Well, he assumes they're going to be infected because that's what he's looking at. What happens after you've been infected? What are the chances of passing it on? Exactly. And and here's maybe the biggest problem with his report. He's taking the entire University of Washington employee population of 35000 employees and assuming they all have the same risk of contracting and spreading covid. And of course, this case involves 21 employees, 19 of whom worked in direct patient care. Sixteen of those were direct patient care. Three were indirect patient care dealing with what Dr. Cohen called the most complex and medically vulnerable population in the entire region. So and of course, they worked in jobs like registered nurses and surgical facilities, respiratory therapists, by the way, the same jobs that were at issue in the Williams V Legacy Health case. So that assumption that a physics professor or a literature professor is at the same risk of transmitting covid contracting and transmitting covid as a physician or a physician assistant working at Harborview is totally fallacious. And I think just Dr. Rich's underlying conclusion, he says it's irrational for the state, for the university to mandate vaccination because the risk of a vaccinated person is high enough that there's no reason not to. There's no reason not to just allow unvaccinated people to continue working. That is just a it's a false logic. Doesn't it depend on the number? And this is where I might be misunderstanding, because if the numbers of religious accommodations were higher. Then obviously that increases the risk more. I mean, that's what I'm getting at. Like, wouldn't this be different? I understand we're dealing with the 95 percent number, but if it were if the vaccine were only 10 percent, you seem to suggest that wouldn't make any difference. It seems like it makes a huge difference if the vaccine were only 10 percent effective. I know that's not the facts we're dealing with, but that's why I'm getting that isn't isn't the proper comparison here. How much greater was the risk than what was already being tolerated? And there was already a 5 percent risk factor being tolerated, right? Even if you required everybody to get the vaccine, 5 percent, it wasn't going to work. I'm not sure I would say that the risk was being tolerated. It's just that there wasn't anything practically within the state's control that they could do about it. And there again, you know, as the Peterson case says, the covid pandemic required employers. The problem with that is it or it's a ratchet down to just say. At that point, you're not going to allow any religious accommodation because any religious accommodation is going to increase the risk. And so the whole point is, why are we even going through this process? Because we know we're not going to give it, because if we give one person a religious accommodation or if we give 10 people or if we give 100 people. Any of that is unacceptable. So here the record shows that many religious accommodations were afforded. In fact, unlike even in the Seagraves case, this case shows that there was a higher rate of accommodating religious on the exemptions or the accommodations, more UW employees were those were nonpatient contact individuals. This was within University of Washington Medical Center.  But within University of Washington, right. But still, they were nonpatient. They were fiscal analysts or whatever who could do their jobs remotely or otherwise without risk of interacting with patients or with other employees who did interact with patients. That would be the indirect patient contact. So the problem here is that the pool of this plaintiff group happens to be a pool of. 19 were direct or indirect patient. Number 20 was the woman from the School of Nursing who acknowledged had some patient contact. And number 21 was the guy that spent like 20 percent of his time in a small boat with other people.  This pool of. Of people who obtained religious exemptions were a group that, based on what they did, could not be accommodated. Whereas they were willing to accommodate anybody they could, whose jobs did not involve the risk of the patient contact.  And there's just no case suggesting that in order to measure the undue hardship imposed by an employee who's requesting a religious accommodation or a group of employees that you look at the hardship imposed by all the employees who aren't requesting an accommodation that just puts it that just makes it backwards. This comparable theory. And by the way, many district courts have simply excluded Dr. Rish's opinion in that regard as an improper legal opinion, because it's essentially saying to the court, here's how you should measure undue hardship, saying how much risk you should be required to bear.  And that wasn't done here, right? I mean, that's what's that's what I'm. The plaintiffs have to come forward with a genuine issue of material fact, Dr. Rish comes forward. Why was he rejected by the district court? Not because he wasn't a qualified expert, not because he was coming forward with a legal opinion. He just said the facts that Dr. Rish is weighing in on are not material to the legal question of undue burden. Correct. And I think the district court's opinion in this regard was clear. Judge Beckman focused on the fact that Dr. Rish is not claiming that the vaccines were ineffective. And I view that as a shorthand of saying he is not arguing that the vaccines did not substantially reduce a vaccinated person's risk of contracting COVID. But other district courts have expressed criticism and concern with Dr. Rish's opinion. That's the Rosa v. City of Issaquah case, Strandquist, Luxton, which, again, is Friday, Richardson v. National Basketball Association. But we can't really weigh in on that, right, because we're stuck with what the district court did here. In a sense, but the courts exercise a gatekeeping function under Dalbert, not only formally, I don't think we can. I mean, if he wasn't rejected under a Dalbert theory below, I mean, you didn't really advance a did you make a Dalbert motion below? The procedural posture of this case is interesting. It wasn't time for Dalbert motions yet. The district court created two different tracks for summary judgment. And this was both parties moved at the first track, which was before the motions and limine deadline. So even if this court were to find disagree with Judge Peck, we'll have to go back down and have a Dalbert hearing.  So the point of the data not being available was something we commented upon in both Peterson and Williams. And so at least to that extent, the Court of Appeals can say, well, this isn't on the playing field at the right time. I agree, Judge Clifton. I think this court can look at the totality of Dr. Rish's opinions and all their flaws informed by the decisions of many district courts that have rejected them in addition to the court below and say, this just doesn't create a genuine issue of material fact. So my friend on the other side mentioned that under OFM guidance, all accommodations were supposed to be temporary. So I think if you actually look to the record, and this is at 10 ER 2428, what that state human resources guidance is showing is it's about telework, and it's clearly communicating the thrust of it is, look, state agencies, if you give an employee an accommodation, if you grant an accommodation, and it's often case it's telework, make sure you're not communicating that you'll be able to telework in perpetuity. Make sure you're communicating to your employee that, hey, we might have a more in-office type environment as we're moving towards 2022 and coming into the office more. So it's not about reviewing accommodations every 60 days, whether they're granted or denied. It's very much geared towards that telework and making sure employees don't think that they now have a license to telework for the rest of their careers. Which law firms have been struggling with for several years now. I think ours has found the right balance, three days a week in the office. One other point that the employees make is about patience and visitors, and arguably it's not even preserved, but they say that the fact that the University of Washington didn't require patients or their loved ones to be vaccinated when they're receiving care, that somehow renders the policy not generally applicable. I think the court should reject that principle. In the Kane court in the Second Circuit, which rejected the same kind of analogy with respect to a student vaccination mandate where bus drivers and visitors didn't have to be vaccinated, no court has ever hinted that a law must apply to all people everywhere at all times in order to be generally applicable. It can apply to employees and other comparable employees, and that's enough. My colleague mentioned the Novavax vaccine. There's nothing in the record to suggest that the Novavax vaccine would be acceptable to any of the plaintiffs here, nor did any of the plaintiffs here in their declarations suggest that their opposition to COVID vaccines have changed. So the idea of, like, there needs to be a temporary accommodation for religious objectors just doesn't apply to their particular cases. I think I would just close by emphasizing, as the court did in Peterson, that the pandemic forced the state to make decisions very quickly and with limited information. The university relied on the scientific information then available and acted in the best interests of its employees and of the community, and for that reason, we believe that there is an undue hardship. The WLAD claim fails, and for many of the reasons discussed earlier, the free exercise claim also fails as a matter of law, and the court should affirm the court below. Thank you. Thank you. Got a minute for rebuttal? Not that we've ever allowed you to stay within that. So, I mean... So, your honor, on Peterson and Williams, accepting the premise that a substantial increase in infection or transmission rate can be an undue hardship, taking that premise as accepted, the university explicitly and affirmatively decided to turn a blind eye to that undue hardship when it came to its objecting population and explicitly foreclosed that same pathway to retaining their employment for its religious population. So, even if we assume that premise and we set aside the fact that Williams and Peterson, for that matter, were decided without rebuttal... Rich doesn't go to that fact. No, your honor, it doesn't, and that's the distinction between the Title VII issues that were decided in Williams and the free exercise issues, which we have undue hardship here as well, but focusing specifically on free exercise. If we accept that the university was correct in analyzing that it was an undue hardship to allow anyone to work unvaccinated, they cannot then explain why they allowed people with secular objections to continue working unvaccinated. That is treating the same conduct that undercuts the compelling government interest worse for no other reason than this group of people being in a religious class. So, that's why Williams does not affect, and in fact, I would argue, accentuates the free exercise issue here. But wasn't the same issue... You're saying the same issue wasn't raised in Williams, the discrimination? I'm saying that even if we assume... I don't believe it was, your honor. I think that was strictly a title VII. But even if we assume, we accept the premise that an unvaccinated worker poses an undue hardship, the university still cannot square how its explicit policy, its communications from HR said, we're going to accept that undue hardship. It could be an undue hardship, but we're going to accept it. But only if you have a secular objection, not if you have a religious one. I don't think that passes scrutiny. Your honor, there's been some anecdotal evidence about Dr. Rich being excluded from other cases. Stranquist was one that was listed by counsel. Dr. Rich testified to the jury in Stranquist. I was there. So, we can't really accept, I don't think, anecdotal examples. Sounds like even if you were to win and we were to remand or reverse, they're still going to go through a Daubert hearing for Dr. Rich. Either way, right? I would assume they would. Yeah. I don't think that's dispositive, though, of on this record, the expert opinions that were competing before the court and the court below electing to take the move inside. If we find this, that creates a genuine issue of material fact. If it creates it, yes, your honor. If it creates a genuine issue of material fact, then summary judgment should not have rendered in the movement's favor, excuse me. To Judge Clifton's point, he mentioned one of the individuals in our group spending 20% of his time on a small boat. I don't believe that's what the record actually reflects. He was on the research vessels that the university operates for NOAA, right? That's what we're talking about. That is correct, your honor, but if we look at the declarations submitted by Mr. Avery Snyder, I think you will see that there is a very stark difference between what the HR individual who submitted a declaration on behalf of the university said Mr. Snyder's job was and what Mr. Snyder said his job was. But you're not quarreling with the fact that the billeting on those research vessels is in very close quarters. I would not quarrel with the billeting, but I would quarrel, I guess this is an illustration of error by the district court to have accepted the facts of the movement is true and then ultimately rendering summary judgment in the movement's favor. But you're not disputing the close quarters, which as I understood it from reading the record was the basis for the decision that that person posed a risk to co-workers if he or she was not vaccinated. I would agree that that is a fair, I agree that HR from the university submitted a declaration to that effect. I would suggest, your honor, that the Mr. Snyder's- I look at your brief and I don't see discussion of individual employment circumstances. I see much broader attacks. You're now suggesting that maybe employee 21 should be treated differently. Where in your brief do you make that argument? Your honor, that's not exactly the point that I'm trying to make. So I'm sorry, I'm doing it inarticulately. My point is that one of the fundamental flaws below was an acceptance of the university's version of facts as the movement, as illustrated by Mr. Snyder, when you contrast his- And you don't talk about that in your brief, do you? That's correct, your honor, your comment triggered in my mind. That's fine, but if there's a reason you argue this person should be treated differently, we would expect to see that argument. And now you're suggesting a kind of- And your honor, I don't think what I'm arguing is that this specific person should be treated differently. It's an illustration of what we assign error to below, and that is a district court accepting the movement's version of the facts across the board. No, because either way, there's close quarters. You're quarreling perhaps with the accommodation decision we've heard, and I assume is the case that where you could accommodate an employee with a religious exemption because they can work remotely, employee 21 isn't working remotely. Now, he may be arguing that there are other things that could be done that would prevent transmission, but that isn't accepting the university's version of facts. That's accepting the fact that he can't work remotely. I think that would- And you're not contesting that. For that specific individual, I actually don't know the answer to that because I don't think the discussion was had with him. So I actually can't answer that one way or the other, your honor, but more fundamentally- You agree at the end of the day, we're stuck with the record that's before us. Yes, your honor. The arguments that you made. Yes, of course, your honor. I think we've got that in spades. And so with that, I think we're going to go ahead and close out this great series of cases. Thank you for the colloquy. It's been very helpful on all three cases. This case is now submitted. And we are going to take a short five-minute recess while we reset our brains out of the COVID vaccine cases and come back and hear our final case for the day. Thank you all.
judges: TALLMAN, CLIFTON, NELSON